# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SONIA ANTOINETTE DODD,

        Petitioner,

vs.                         Case No.:    3:12-cv-1084-J-34MCR
                                                        3:09-cr-51-J-34MCR-4

UNITED STATES OF AMERICA,

        Respondent.

_____/

## REPORT AND RECOMMENDATION[1]

Before the Court is Petitioner Sonia Antoinette Dodd's Motion to Vacate Under

28 U.S.C. § 2255 (Doc. 1)[2], in which Dodd claims that trial counsel rendered ineffective

assistance in advising her on her decision to plead guilty.  Specifically, Dodd contends

that counsel failed to advise her that pleading guilty would subject her to mandatory

deportation, and that such advice was deficient under Padilla v. Kentucky, 559 U.S. 356

(2010).  Dodd further alleges that she would not have pled guilty had she known of this

consequence, because her entire family is in the United States and she has few, if any,

---

[1]      A party may file specific written objections to proposed findings and a recommended disposition within 14 days of service of a magistrate judge's report and recommendation. Fed. R. Civ. P. 72(b)(2); Rule 12 of the Rules Governing Section 2255 Proceedings; see also Fed. R. Civ. P. 6(d) (adding three days after period would otherwise expire if party must act within a specified period after service and service is made by electronic filing as provided by Fed. R. Civ. P. 5(b)(2)(E)).  The district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [She] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3).  However, a district judge need not consider frivolous, conclusory, or general objections.  Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988).  A party's failure to specifically object in writing may alter the scope of appellate review.  See Fed. R. Civ. P. 72(b)(3); Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013).

[2]      Citations to Sonia Dodd's criminal case file, United States of America v. Frederick Campbell, et al., 3:09-cr-51-J-34MCR, are denoted as "Crim. Doc. ___."  Citations to Dodd's civil § 2255 case file, 3:12-cv-1084-J-34MCR, are denoted as "Doc. ___."

ties to the United Kingdom, where she would be deported.  This is the only issue before the undersigned for a report and recommendation.[3]

The Honorable Marcia Morales Howard granted Dodd's request for an evidentiary hearing on the <u>Padilla</u> claim and, under 28 U.S.C. § 636(b) and Rule 8 of the Rules Governing Section 2255 Proceedings, referred the motion to me to appoint counsel to represent Ms. Dodd, conduct the hearing, propose factual findings, and recommend a disposition consistent with <u>Padilla v. Kentucky</u> and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  (Doc. 19 at 26-27).  Consistent with <u>Padilla</u>, I examined:

> (1) whether trial counsel's advice to Dodd concerning the immigration consequences of pleading guilty fell short of the standard of reasonably effective assistance, <u>see</u> <u>Padilla v. Kentucky</u>, 559 U.S. at 369-70; and
>
> (2) whether there is a reasonable probability that Dodd would not have pled guilty, but would have proceeded to trial, had she been properly advised of the immigration consequences of pleading guilty.  <u>See</u> <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

I appointed Jeremy Lasnetski, Esq., to represent Dodd (Doc. 20), and conducted the hearing on February 9, 2015.  At the hearing, I heard testimony from Sonia Dodd and Wade Rolle, Dodd's trial counsel in the underlying federal criminal case.  I admitted without objection Government's Exhibits 1 through 16.

At the hearing, Dodd and Rolle disagreed about whether Rolle advised Dodd at all about the immigration consequences of a conviction.  Dodd testified that nobody, including Rolle, gave her any advice whatsoever about how pleading guilty could affect

---

[3] Dodd also claimed that her guilty plea was involuntary because she was under the influence of medication during her plea colloquy, that trial counsel gave ineffective assistance or provided deficient advice concerning allegedly inadmissible evidence, and that appellate counsel gave ineffective assistance by failing to raise the <u>Padilla</u> issue on direct review.  By a previous order (Doc. 19), the Court has already determined that these other claims lack merit.

her status as a legal resident alien of the United States.  Rolle testified that he did advise Dodd that pleading guilty would subject her to deportation proceedings, though he did not advise her that, under the circumstances, her deportation was effectively mandatory.  Rolle also testified that Dodd wanted to go to trial until she discovered that her daughter was going to testify against her.  As for the plea agreement, Dodd acknowledged that certain aspects of it benefitted her – chiefly, that it allowed her to plead guilty to a lesser-included offense.  However, Dodd also testified that she would not have pled guilty had she known she could be deported.

Having found that Dodd has a significant credibility deficit and that Rolle was more forthright, I find Rolle to be the more credible witness, and therefore credit his account of events.  Although Rolle did advise Dodd that a conviction could lead to deportation proceedings, I find that under the Padilla framework, such advice was shy of what an attorney should advise a non-citizen client when she pleads guilty to a controlled substance offense.  Where a non-citizen defendant intends to plead guilty to a controlled substance offense (which is also an "aggravated felony" under the Immigration and Nationality Act), an attorney should inform the client that their deportation is presumptively mandatory, as Congress has eliminated nearly every form of discretionary relief that was once available to aliens convicted of such offenses.  Notwithstanding that, I find that other, more compelling considerations influenced Dodd to plead guilty.  As a result, I find there is not a substantial probability that Dodd would not have pled guilty, even had her attorney taken the extra step of advising her that she was ineligible for discretionary relief.

I.      **Background**

Law enforcement has suspected Dodd of trafficking narcotics between California and Florida since as early as 2006.  On two separate occasions in 2006 and 2007, police officers stopped Dodd at Los Angeles International Airport (LAX) on suspicion of drug trafficking – the second time on the basis of a tip from the Drug Enforcement Administration.  (See Crim. Doc. 301 at 13-34, 36-61).  Each time, Dodd either falsely stated the amount of money she was carrying or falsely told officers that she did not have any checked luggage.  On both occasions, officers found Dodd to be carrying tens of thousands of dollars in cash and money orders.  (Id. at 16-18, 48).  Dodd was carrying three cell phones at the time of the 2006 stop (id. at 21), and during the 2007 stop, Dodd had $68,000 concealed in a hidden compartment in her suitcase (id. at 48). Dodd stated she had no idea how the $68,000 got into her bags, and disavowed any ownership of it.  (Id. at 49).  Additionally, a drug-sniffing canine alerted officers to the scent of narcotics in Dodd's luggage during the 2007 stop.  (Id. at 59).  Officers did not find any drugs in Dodd's bags on either occasion, however, and neither stop resulted in Dodd's arrest.

In January 2009, Dodd's sons, Alex and Fredrick Campbell, were arrested after police officers discovered they were in possession of around 100 pounds of marijuana. Further searches of other residences and storage units connected to the family yielded receipts for shipments totaling over 2,000 pounds in weight, additional marijuana, airline and hotel receipts, money-gram receipts, high-powered rifles, and other things.  Shortly thereafter, Dodd and her daughter, Branddie Campbell, were arrested as well.  On February 19, 2009, a grand jury sitting in the Middle District of Florida indicted Dodd,

along with her daughter and two sons, with one count of conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.  (Crim. Doc. 1, Indictment).[4]  In an order finding that Dodd should be detained pending trial, a magistrate judge explained:

> Sonia Antoinette Dodd is charged with a serious drug-related offense.  If convicted, she faces a substantial sentence including minimum mandatory provisions and possible deportation.
>
> The evidence against [Dodd] can be characterized as strong.  According to the government's proffer, this case involves a conspiracy of prolonged duration and a large volume of illicit drugs.  Members of the conspiracy also had access to weapons.  Both Ms. Dodd and members of her immediate family are alleged to have been participants.  The inculpatory evidence is represented to include testimony from cooperating individuals, documentary material, a large quantity of marijuana, and substantial sums of currency.  For example, one of the vehicles rented by [Dodd] and an alleged coconspirator was found to contain marijuana and over $30,000.00 in cash.  When at an airport, on at least two occasions Ms. Dodd was stopped and provided untruthful explanations in regard to significant amounts of currency she possessed.  She has previously admitted her involvement in the marijuana enterprise, at least in part, to law enforcement.  In short, it appears she played an integral role in the alleged conspiracy.
>
> [Dodd] has a troubling criminal record.  Her many convictions seem to reflect that she cannot comport her conduct with the lawful demands of society.  Moreover, she has a history of violating probation on numerous occasions and so has not abided by terms and conditions other courts have imposed.  Ms. Dodd has used over twenty aliases and is an experienced traveler, as evidenced by international and cross-country trips.
>
> Based on the foregoing, it is found that no condition or combination of conditions will reasonably assure Defendant's subsequent appearance at Court proceedings or the safety of any other person in the community.

---

[4]     The original indictment also charged Frederick and Alex Lee Campbell with aiding and abetting each other in the possession of marijuana with intent to distribute (Count Two), as well as with possessing a firearm in furtherance of a drug trafficking crime (Counts Three and Four).  (Crim. Doc. 1 at 2-3).  On September 10, 2009, a grand jury returned a superseding indictment, which incorporated the same charges as those listed in the original indictment.  (Crim. Doc. 146, Superseding Indictment).

(Detention Order, Crim. Doc. 71 at 2).

Alex and Fredrick Campbell proceeded to a jury trial.  On February 19, 2010, both were convicted when the jury returned a verdict of guilty as to all counts in the Superseding Indictment.  (Crim. Doc. 259, Jury Verdict as to Frederick Campbell; Crim. Doc. 260, Jury Verdict as to Alex Campbell).  Three days later, on February 22, 2010, Branddie Campbell pled guilty.  (Minute Entry, Crim. Doc. 271).  Dodd pled guilty the next morning.  (Minute Entry, Crim. Doc. 268).  Dodd changed her plea on the same day that jury selection was set to begin in her case.

Dodd pled guilty pursuant to a written plea agreement.  (Plea Agreement, Crim. Doc. 269).  The Plea Agreement permitted Dodd to plead guilty only to the lesser included offense of conspiracy to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.  (Crim. Doc. 269 at 1). Whereas conspiracy to distribute 1,000 kilograms or more of marijuana entailed a sentence of at least ten years and up to life in prison, see 21 U.S.C. § 841(b)(1)(A), conspiring to distribute 100 kilograms of marijuana carried a mandatory minimum of five years in prison and a statutory maximum of forty years.  See 21 U.S.C. § 841(b)(1)(B); (see also Crim. Doc. 269 at 2).  Furthermore, despite Dodd pleading guilty on the morning of jury selection, the Plea Agreement offered Dodd a two offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).  (Crim. Doc. 269 at 3).

Under the Plea Agreement, Dodd admitted to the truth of the charges and the factual basis, which stated in relevant part:

> During the time frame 2006 through January 2009, the defendant, Sonia Dodd, participated in the conspiracy by sending packages of marihuana

> via Fed Ex and UPS from California to Jacksonville for distribution.  Sonia
> Dodd also participated in the conspiracy by transporting narcotic proceeds
> from Jacksonville to California.  The amount of marihuana attributable to
> Sonia Dodd in the conspiracy equates to offense Level 30, which is 700 to
> 1,000 kilograms of marihuana.

(Id. at 13).  Following a Rule 11 plea colloquy, the Court determined that Dodd entered

into the Plea Agreement knowingly and freely (Plea Transcript, Crim. Doc. 310 at 37-

38), a finding with which Dodd agreed (id. at 38).  Accordingly, the Court accepted

Dodd's plea of guilty.  (Id.)  The Plea Agreement and the record of the plea colloquy are

silent as to whether anyone advised Dodd that she would be deported, however.

Dodd thereafter moved to withdraw her plea of guilty, pro se, asserting that she

pled guilty under duress, that she was heavily medicated, that she received ineffective

assistance of counsel, that her attorney told her to lie to the Court, and that she "was

the victim of massive negative exposure from the newspapers and the internet."

(Motion to Withdraw Guilty Plea, Crim. Doc. 284).[5] Dodd also moved, pro se, to dismiss

the indictment, in which she repeated several of the claims made in the Motion to

Withdraw Guilty Plea, in addition to claiming that the government violated her right to a

speedy trial and that her attorney fed her misinformation leading up to her decision to

plead guilty.  (Dodd's Motion to Dismiss, Crim. Doc. 287).  The Court struck the pro se

motions, pursuant to local rules, because Dodd was represented by counsel when she

filed them.  (Order, Crim. Doc. 294).

Dodd proceeded to sentencing on September 30, 2010, at which the Court

determined that her Sentencing Guidelines offense level was 30, and her criminal

history category was VI.  (Sentencing Transcript, Crim. Doc. 379 at 38).  Consequently,

---

[5]      Dodd never offered any evidence of what this "massive" newspaper and internet exposure was.

Dodd's advisory sentencing range was 168 to 210 months in prison.  (Id.)  The Court sentenced Dodd to a term of 175 months in prison.  (Id. at 94).

Dodd thereafter appealed to the Eleventh Circuit, claiming that the government breached her Plea Agreement and that her sentence was unreasonable.  See United States v. Campbell, 434 F.App'x 805, 811-12 (11th Cir. 2011).  The court of appeals found that the government had not breached her plea agreement, id. at 811, and that the challenges to her sentence were barred by a valid sentence-appeal waiver, id. at 811-12.  Accordingly, the Eleventh Circuit affirmed her conviction and sentence.  Dodd requested certiorari review by the Supreme Court, but her petition for a writ of certiorari was denied on February 27, 2012.  Dodd v. United States, 132 S. Ct. 1648 (2012).  Dodd's conviction and sentence thus became final upon the denial of certiorari review.  Washington v. United States, 243 F.3d 1299, 1300 (11th Cir. 2001).

## II.     Dodd's Section 2255 Motion

Under 28 U.S.C. § 2255(f)(1), Dodd had one year from February 27, 2012, or until February 27, 2013, to file a timely motion to vacate.  As Dodd filed the Motion to Vacate on September 27, 2012, her Motion to Vacate is timely.

In her Motion to Vacate (Doc. 1) and supporting memorandum (Doc. 2), Dodd asserted that counsel failed to inform her that pleading guilty would subject her to deportation.  (Doc. 1 at 4; Doc. 2 at 8).  Dodd states that "[a]t no time has counsel, the Court nor the probation officer advised Ms. Dodd that under Title 8 U.S.C. § 1101(a)(43), she was subject to mandatory deportation."  (Doc. 2 at 9).[6]  Dodd states

---

[6]     Title 8, United States Code, Section 1101(a)(43) lists, for purposes of the Immigration and Nationality Act (INA), what offenses constitute an "aggravated felony."  Specifically, § 1101(a)(43)(B) describes " illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug

that she "only learned that she could be deported after being shipped off to prison and seeing women just like her, deported after unknowingly pleading guilty." (Id.) Dodd states that she has been in the United States since early childhood, she lacks family ties outside the United States, and her entire family resides in this country. (Id.) Accordingly, Dodd asserts that she would not have pled guilty had she known that deportation was a consequence of her conviction. (Id. at 9, 10).

### III.   Evidentiary Hearing

### A. Sonia Dodd's Testimony

Dodd testified as follows. (Doc. 29 at 9-64). Dodd was born in London, England, and remains a citizen of the United Kingdom. (Id. at 10). In 1975, when Dodd was four years old, she and her family moved to the United States. (Id. at 10-11). Dodd became a legal resident alien (id. at 11), and that remains her status today (id. at 13). Dodd attended elementary school, middle school, and high school in Miami, Florida, as well as one year of college and technical training to become a phlebotomist. (Id. at 12). Dodd's six children and three siblings live in the United States, and her children are each United States citizens. (Id. at 11). Dodd has not lived in England since moving to this country (id. at 12), and she does not know anyone in the United Kingdom (id. at 22). Dodd testified that her family would not visit her in England because it would be unaffordable (id. at 21-22), she does not have a job arranged in England (id. at 22), and

---

trafficking crime (as defined in section 924(c) of Title 18)" as an "aggravated felony." In turn, any alien who is convicted of an aggravated felony following their admission to the country is deportable. 8 U.S.C. § 1227(a)(2)(A)(iii). Not only that, but a non-citizen convicted of an "aggravated felony" is "not only deportable; [s]he is also ineligible for any discretionary relief" that the Attorney General might offer. Donawa v. U.S. Att'y General, 735 F.3d 1275, 1279 (11th Cir. 2013) (citing 8 U.S.C. § 1229b(a)(3), (b)(1)(C)).

she does not know anyone who would support her financially were she to be deported there (see id. at 22).

Dodd testified that she wanted to go to trial up until the eve of jury selection.  (Id. at 35).  During the four-month period preceding her trial, Dodd testified that she met four times with counsel, Wade Rolle – each time to discuss issues for trial.  (Id. at 15).  At around 10:00 pm or 10:30 pm on the night before trial, Dodd received a phone call from her sister and Rolle.  (Id. at 16).  Rolle, who had been monitoring the trial of Dodd's sons (id. at 37-38), called because he had learned that Dodd's daughter was going to testify against her (id. at 41).[7]  Rolle and Dodd then discussed changing her plea to guilty (id. at 13), something she and Rolle had not discussed before that point (id. at 15-16).  Dodd stated that she had no interest in pleading guilty, but she felt she had no other choice because she felt that Rolle had not prepared for trial.  (Id. at 43). According to Dodd, Rolle suggested pleading guilty.  (Id.)  Dodd testified that during the phone conversation, there was no discussion of the immigration consequences of pleading guilty.  (Id. at 16).[8]  Given the late hour of the phone call, no written plea agreement had yet been prepared for Dodd to review.  (Id. at 17).

The next morning, Dodd was transported to the courthouse, and at that point the details of what offense Dodd would be pleading guilty to were still unresolved.  (See id. at 17).  Dodd then met with Rolle, two assistant United States attorneys, and another lawyer in the holding area.  (Id. at 18).  One of the prosecutors presented Dodd with the

---

[7]     The timing is consistent with Branddie Campbell's plea of guilty, which was given on February 22, 2010 (Crim. Doc. 271), whereas Dodd was scheduled to begin trial on February 23, 2010.

[8]     Rolle was Dodd's second court-appointed lawyer.  Prior to Rolle, Dodd had been represented by another lawyer, Bruce Culbert, for three to four months.  (Id. at 14).  Culbert withdrew well before Dodd pled guilty, but Dodd testified that Culbert also did not advise her of the immigration consequences of pleading guilty.  (Id.)

Plea Agreement and reviewed its terms with her.  (Id. at 18-19).  There was no

discussion of the immigration consequences of pleading guilty, however.  (Id. at 19).

The discussion mainly focused on reducing Dodd's offense level, and the uncertainty of

whether the district judge would accept the Plea Agreement.  (Id. at 19-20).  Thereafter,

Dodd proceeded to the courtroom, where she changed her plea to guilty.  (Id. at 20).

Dodd did acknowledge that being allowed to plead guilty to a lesser-included offense

benefitted her.  (Id. at 48).  However, Dodd maintained that at no point did any of the

attorneys, the Court, or any other source inform her of the immigration ramifications of

pleading guilty.  (Id. at 20-21).  Dodd was unaware that she would be deported due to

her conviction (id. at 22), and she only learned of this when she arrived at prison (id. at

57-58).  Dodd was also unaware that she would be ineligible for release on bond, or that

she would not be allowed to re-enter the United States on account of her conviction.

(Id. at 21).

    Dodd denied having any independent knowledge that she would be deported if

she pled guilty.  Dodd acknowledged that, in preparing the Presentence Investigation

Report (PSR), her probation officer raised the issue of her immigration status.  (Id. at

62).  However, Dodd stated that the probation officer merely asked her what she

planned to do following her release from prison.  (Id.)  Dodd testified that this

conversation did not cause her to believe that she would be deported.  (Id. at 62-63).

Dodd testified that she did not think deportation was possible because she had lived in

the United States for so long.  (Id. at 63).

    At the hearing, Dodd further testified, under oath, that she is not guilty of any

crime.  (Id. at 23, 53-54).  Despite having been under oath when she pled guilty (see id.

at 24), Dodd insisted that she did not do any of the things she admitted to in the factual

basis of her Plea Agreement (id. at 23).  Although Dodd had assured the Court at the

plea colloquy that she voluntarily pled guilty, Dodd testified at the evidentiary hearing

that she "felt forced" to do so.  (Id. at 60-61).  Dodd also admitted to having used

numerous aliases in the past (id. at 24-25), including the names "Lee Maidorn Lemon"

and "Bonnie Morehead," (id. at 27).  Dodd's PSR listed several other aliases associated

with Dodd, including "Lemon Madison Lee," "Yvette Rodriguez," "Lashondria April

McGhee," "Louis Marie," "Trudy McNeil," and "Lop Eliana," but Dodd denied using any

of those.  (Id. at 26-27; see also PSR at unnumbered second page).  Dodd vaguely

explained that law enforcement simply "booked" her under those names "[b]ecause

that's in the – it was in the case."  (Doc. 29 at 28).  Additionally, Dodd's PSR reported

that she has used multiple social security numbers and birth dates (PSR at unnumbered

third page), but Dodd denied ever using them, and responded that law enforcement

officers just made those up (Doc. 29 at 28-29).  Dodd further denied the truth of a

magistrate judge's findings, in a pretrial detention order, that Dodd has violated

probation numerous times in the past, that she has used more than 20 aliases, and that

she is an experienced cross-country and international traveler.  (Id. at 31).  Dodd

testified that she has never violated probation, and that she has only been outside of the

United States once.  (Id.)

## B. Wade Rolle's Testimony

Wade Rolle testified as follows.  (Doc. 29 at 65-99).  Rolle has been practicing

law in Jacksonville, Florida since 1991.  (Id. at 65).  His practice focuses on criminal

defense, personal injury, and family law.  (Id.)  In addition to being licensed in Florida,

Rolle is licensed to practice law in Georgia, South Carolina, and North Carolina.  (Id. at 66).  Rolle has been a member of the CJA panel for the Middle District of Florida since approximately 1993 (id.), and in that capacity he estimated he has handled over a hundred federal criminal cases (id. at 67).  Rolle also estimated that he has handled thousands of criminal cases in state court, as both an assistant state attorney and as a defense attorney.  (Id.)

The Court appointed Rolle to represent Dodd after her previous lawyer had withdrawn.  (See id. at 67-68).  Rolle confirmed Dodd's testimony that she wanted to go to trial up until the day before jury selection:

> Ms. Dodd, as she indicated, was always in a trial position, that she wanted to try the case.  And that was her position up to the eve, the day before trial.  We discussed whether or not she'd be interested in any plea of any sort, and she was not.  She did not indicate she was interested.

(Id. at 68).  According to Rolle, he met with Dodd seven or eight times before her trial date – four times at the detention facility in Ocilla, Georgia, and three or four more times at the courthouse.  (Id. at 69-70).  Rolle testified that each meeting concerned trial strategy and lasted about an hour.  (Id. at 70).

In preparation for Dodd's case, Rolle attended the trial of her two sons in order "to get a better understanding of what was going to happen at [Dodd's] trial.  It's usually almost the exact same testimony."  (Id. at 75).  Rolle relayed to Dodd the outcome of their trial, as well as who the witnesses were, what they testified, and his impression of the quality of the evidence.  (Id. at 76).  Although the jury found Dodd' sons guilty, Dodd "was still adamant about going to trial… up to the last minute."  (Id.)  But on the night before trial, Rolle testified that he

was made aware that [Dodd's daughter] would likely testify against her.
And that seemed to somewhat deflate her intentions of going to trial, and
she started talking about, "Well, what about a plea agreement?"  I went
into that discussion with her.  It was the first time we really talked about
it.***

(Id. at 77-78).  Rolle was concerned it would be too late to negotiate a plea bargain, but

he contacted the prosecutor late that evening to discuss the matter.  (Id. at 78).  After a

brief conversation with the Assistant U.S. Attorney, Rolle notified Dodd that he believed

something could be arranged the next morning.  (Id.)

In regard to what advice Rolle gave Dodd concerning immigration consequences,

Rolle testified as follows:

Q:     Now, the charge that was lodged against Ms. Dodd, did you know
       that that is a mandatory deportation offense?

A:     I believe I – I – I'm trying to think back at that time.  Yes, I knew it
       would lead to deportation.  When you say "mandatory," I knew it
       was a – I know the term now to be an aggravated felony, but I know
       that it would lead to deportation proceedings against whoever was
       involved.

Q:     And did you have discussions along those lines with Ms. Dodd
       before the – even before the plea discussion came up with regard
       to what would happen if she was convicted?

A:     I do remember because I was aware of her immigration status, that
       she was not a U.S. citizen, that she was a permanent resident of
       some sort and that she had British citizenship.  And I also knew that
       it was of Jamaican heritage.  So I would have had discussions that
       "could lead to deportation."

       And there's a term that someone's using that's called "mandatory
       deportation."  I know that you're still entitled to some hearings of
       some sort even with an aggravated felony because I've handled
       one of those myself where the guy was not deported.  But it could
       lead to deportation, would have been my term.  And that would
       have been – the reason why I know I used that, because it's a term
       I use in all my state court cases too, even misdemeanors.

Q:     And what is your experience with regard to the immigration laws
       and how those things kind of come into play, either personally or
       through other defendants that you've had in the past?

A:     Well, I've had other defendants in the past that are not U.S.
       citizens.  I advise all of my clients since probably the early '90's that
       any charge could lead – I ask them if they're a U.S. citizen, then I
       say, you know – and some people don't know.  And I ask them
       where they were born and get into the heritage background, and I
       say "could lead to deportation."  And I've been doing that as a
       matter of habit since the early '90's on any charge that anyone
       pleads to, except maybe traffic offenses.

Q:     When you say it could lead to deportation, do you go on to further
       explain the immigration process, like you were just referring to a
       hearing –

A:     Right.

Q:     - that would be before an immigration judge?  And what did you tell
       Ms. Dodd in connection with that?

A:     I just remember saying that this could lead to deportation.  I know I
       did not touch any issue regarding detention because I rarely go into
       it that deep.  But I probably said, you know, this charge – with her,
       with a federal indictment over drugs, I would have said "would likely
       lead to deportation" in her case.

Q:     And did you discuss with her that process after the fact, what would
       happen if you were convicted and what the process – the
       immigration process would be?

A:     Well, I wouldn't say they would pick you up.  I would say, you know,
       basically, "This is going to lead to deportation proceedings and the
       likelihood is that you're going to be deported."  I seem to recall she
       said something with her significant family ties; because of her
       children, she thought that that was not likely to occur.  But it has
       been some stretch of time.  It's been approximately five years since
       that – those conversations would have likely have occurred.

(Id. at 70-73).

       On the morning that Dodd pled guilty, Rolle met with Dodd at around 7:30 or 8:00

a.m. in the holding area to inform her "that it look[ed] like things were going to be in

place," but that the Court still had to approve any plea agreement.  (Id. at 78).  At

around 9:00 a.m., the parties convened in court to notify the District Judge that they

intended to enter into a plea agreement, and the District Judge allowed the parties time

to finalize the arrangement.  (Id. at 79).  While the prosecutor drafted the plea

agreement, Rolle recalled conferring once more with Dodd.  Rolle recollected the

meeting as follows:

> Q:    What did you discuss with [Dodd] at that point?
>
> A:    We were discussing the – I think at that time that's when we were
>        coming up with a lesser-included.  I can't remember if it was the
>        night before or whatever, but there was talk of a plea not – to a
>        lesser-included penalty of the indictment or thereabouts.  And we
>        were there discussing the amounts, we were discussing the case in
>        general, whether or not she wanted to really do this, and she
>        indicated she wanted to go ahead and plea.  It was during that time
>        that I think that we again approached the issue that she was not a
>        U.S. citizen.  I didn't know exactly how her permanent status would
>        be affected, but she would likely be subject to deportation
>        proceedings.  I would not have said "likely to be deported" or the
>        term "mandatory deported."  I would never have said that to her.
>
> Q:    What did you say?  Do you recall?
>
> A:    I said "Likely subject to deportation proceedings.  You will face
>        consequences of this."

(Id. at 79-80; see also id. at 91).  Rolle did not believe that Dodd's deportation was

effectively mandatory, but rather that "she could fight the deportation proceedings and

the judge could rule adverse to the mandatory deportation."  (Id. at 92).  Rolle, who

does not specialize in immigration law, acknowledged that he did not know that a

conviction for an aggravated felony would render a non-citizen ineligible for certain

forms of relief from deportation, such as cancellation of removal or a waiver of

conviction.  (See id. at 92-94).

Toward the end of the hearing, the undersigned asked Rolle to address Dodd's claim, made in a previous filing, that she felt under duress when she pled guilty.

THE COURT:       Mr. Rolle, Ms. Dodd indicated in one of her filings with the court that she felt she was under duress with regard to her decision to enter a plea.  What's your assessment, given that you were representing her, as to whether she was under duress?  Can you address that?

THE WITNESS:     I didn't feel like she was under duress.  She didn't like the fact that there was the possibility that her daughter could come in and testify against her.  Also I – you know, I didn't think that – there was some talk of what her sons would do, but I didn't have any indication that her sons were considering some sort of grasp at substantial assistance being that they were convicted because it was just too fresh on their convictions.

But she was upset at the possibility of her daughter testifying against her in trial.  That affected – that's what affected the plea.  Her son's convictions did not.  But she was aware of the evidence that was presented at trial.

I'm not sure if there was transcripts given to her.  Now, she seems to recall transcripts.  I don't think I was able to get trial transcripts of her sons' case.  But I think she was notified either by phone or something almost daily what had taken place in their trial and what I thought about the evidence.  It seems like we had a lot of contact in that brief period of time of their trial, so that she understood as it was going on what her sons were facing.

(Id. at 98-99).

## IV.    Proposed Findings of Fact

In proposing the following findings of fact, I have evaluated the aforementioned testimony, the evidence introduced at the evidentiary hearing, as well as the record from

the underlying criminal case.  The merits of Dodd's <u>Padilla</u> claim depends on what advice Rolle provided concerning the immigration consequences of pleading guilty, as well as whether Dodd would have pled guilty regardless of the immigration consequences.  Because Dodd's and Rolle's accounts differ significantly on these issues, it is necessary to make a credibility determination.

For her part, Dodd did not appear to be a credible witness.  Closely observing her demeanor and examining the content of her testimony, she did not impress me as someone who was being truthful.  For one, Dodd testified at the hearing, under oath, that she is completely innocent.  (Doc. 29 at 23, 54).  Dodd also once testified, under oath, that she participated in a trafficking conspiracy by taking narcotics proceeds from Florida to California, and by mailing marijuana from California to Florida.  (Crim. Doc. 269 at 13; <u>see also</u> Crim. Doc. 310 at 30-34).  Dodd testified at the hearing, under oath, that she was forced to plead guilty.  (Doc. 29 at 60-61).  Dodd also once testified, under oath, that it was her own voluntary decision to plead guilty.  (Crim. Doc. 310 at 34-35).  Dodd testified at the hearing, under oath, that she has never once violated probation.  (Doc. 29 at 31).  Dodd's PSR, and the Dade County Circuit Court[9] docket, each reflects that Dodd has violated probation on at least six occasions.  (<u>See</u> PSR at 13-18).  Dodd testified that she has never used the aliases, social security numbers, and alternative birth dates reported in the PSR, but rather that law enforcement simply made up that information.  (Doc. 29 at 28-29).  Dodd has seventeen convictions, at least fourteen of which involved dishonesty, including forgery, fraudulent use of a credit card, use or possession of fake or stolen driver's licenses, organized fraud, and obstructing by giving

---

[9]      The Dade County Circuit Court's docket may be searched at https://www2.miami-dadeclerk.com/CJIS/CaseSearch.aspx.

18

a false name.  (See PSR at 13-18).  Additionally, Dodd has an obvious interest in the outcome of these proceedings, and so has an incentive to be untruthful.  Because Dodd's record gives me little confidence that she has regard for candor, I am not inclined to credit her testimony except to the extent that it is undisputed or independently corroborated.

For his part, Rolle's testimony appeared credible.  Observing his demeanor and examining the content of his testimony, he impressed me as someone who was telling the truth.  He has neither reason to lie nor a personal interest in the outcome of Dodd's § 2255 motion.  Rolle is a member in good standing of the Florida Bar, and as such, he is an officer of the court with a duty of candor.  See Rule 4-3.3(a) of the Rules Regulating the Florida Bar ("A lawyer shall not knowingly… make a false statement of fact or law to a tribunal[.]").[10]  His memory of the case was strong, and his testimony was consistent with the exception of only one detail:  Rolle initially recalled that he would have advised Dodd not only that she would be subject to deportation proceedings, but that deportation was likely.  (Doc. 29 at 72-73).  Shortly thereafter, Rolle recalled that he would have advised Dodd that she would be subject to deportation proceedings, but that he definitely would not have advised her that deportation was likely.  (Id. at 80).  Because Rolle seemed more confident that he did not advise Dodd that deportation was likely, I adopt that account, and recommend

---

[10]     At any stage of a case and on its own, a court may take judicial notice of a fact that cannot be reasonably disputed because it is either generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)-(d).  If a court takes judicial notice of a fact before notifying a party, the party may still be heard upon request.  Fed. R. Evid. 201(e).  Objections to a magistrate judge's report and recommendation provide an opportunity to be heard.  Amadasu v. Christ Hosp., 514 F.3d 504, 508 (6th Cir. 2008).  Because Falcon's membership "in good standing" of the Florida Bar can be readily and accurately ascertained from Florida Bar records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned, I take judicial notice of those facts.

finding that Rolle did not so advise Dodd.  Either way, however, Rolle consistently testified that he advised Dodd that she would be subject to deportation proceedings if convicted, and he also consistently testified that he did not advise her that deportation would be effectively mandatory.  (Id. at 70-73, 80).  Overall, Rolle's testimony was frank and his recollection of what transpired in the case made sense.  Therefore, I adopt his account of events.

In consideration of the foregoing, I propose the following findings of fact.  First, I find that Rolle did, at the very least, inform Dodd that she would be subject to deportation proceedings if convicted.  Rolle testified that he has advised every non-citizen client since the early 1990's, as a matter of habit, that a conviction could lead to deportation, and that he gave Dodd the same advice.  (Id. at 70-73).  Having found Rolle to be the more credible witness, I credit this account of events.  I do not find, as Dodd testified, that Rolle never mentioned immigration consequences at all.[11]

Second, consistent with Rolle's testimony, I also find that Rolle did not advise Dodd that if she pled guilty, she would be ineligible for virtually any form of relief from deportation.  (See id. at 80).  Put another way, Rolle did not advise Dodd that deportation in her case was effectively mandatory.  (Id. at 80, 91).  Rolle recalled that he thought Dodd could successfully fight deportation proceedings (id. at 92), but he was not aware that a non-citizen convicted of an "aggravated felony" was ineligible for certain forms of discretionary relief, such as cancellation of removal or a waiver of

---

[11]     Even without Rolle's testimony, I would not credit Dodd's testimony that not one person informed her, prior to pleading guilty, that she could be deported.  (See Doc. 29 at 20-22, 57-58).  In the first paragraph of findings in Dodd's detention order, the magistrate judge observed that Dodd faced possible deportation if convicted.  (Crim. Doc. 71 at 2).  Given that the prospect of deportation factored prominently into the magistrate judge's decision to order that Dodd be detained pending trial, it is unlikely that deportation was never discussed sometime before, during, or after the detention hearing.

conviction (see id. at 92-94).  Indeed, Rolle recalled that Dodd believed she would not be deported because of her significant ties to the country, and Rolle did not state whether he corrected Dodd by notifying her that this factor would not prevent her deportation.  (Id. at 73).  Thus, while Rolle may have notified Dodd that she could be deported if convicted, it does not appear that he further advised her of the near-certainty of deportation.

Third, I also find that Dodd's decision to plead guilty was influenced by the prospective evidence against her.  The main force behind Dodd's decision to plead guilty was the news that her daughter was going to testify for the prosecution.  Rolle testified that Dodd wanted to go to trial until she learned that her daughter was likely to be a witness against her, which "seemed to somewhat deflate her intentions of going to trial."  (Id. at 77; see also id. at 98-99).  The news prompted Dodd to inquire about a plea agreement.  (Id. at 77-78).  Thus, it appears that Dodd was the first to express an interest in a guilty plea, and she did so to avoid being confronted by her daughter in court.  Additionally, Dodd's decision to plead guilty was likely affected, although to a lesser extent, by seeing her sons convicted, and knowing that much of the same evidence used against them would be used against her.   Rolle testified that he attended the trial of Dodd's sons, and relayed to Dodd what he observed and what he thought of the government's evidence.  (Id. at 75-76).  Rolle recalled explaining to Dodd's sister that the government's evidence was "quite strong."  (Id. at 74).  Rolle did not believe that either of Dodd's sons would testify against her to gain credit for substantial assistance (id. at 98), nor did he believe that their convictions affected Dodd's plea (id. at 99).  However, Dodd was aware of the evidence (id. at 99), and she

likely reasoned that if the evidence convinced a jury to find her sons guilty, it would also convince a jury to find her guilty.  Indeed, the timing of Dodd's guilty plea reflects that this, in conjunction with the news that her daughter would testify against her, likely affected her decision.  On February 19, 2010, a jury found Dodd's sons guilty of all charges listed in the superseding indictment.  (See Crim. Doc. 259; Crim. Doc. 260).  Dodd's daughter, Branddie Campbell, pled guilty on February 22, 2010.  (See Crim. Doc. 271).  Then on February 23, 2010, Dodd pled guilty.  (See Crim. Doc. 310 at 1).

Fourth, I find that Dodd's decision to plead guilty was also influenced, in part, by the provisions of the Plea Agreement that (a) allowed Dodd to plead guilty to a lesser-included offense, (b) gave Dodd a two-offense-level reduction for acceptance of responsibility, and (c) stipulated to a base offense level of 30, reflecting that Dodd was accountable for between 700 and 1,000 kilograms of marijuana (see Crim. Doc. 269 at 13), rather than the 1,000 kilograms or more for which she was indicted (see Crim. Doc. 1 at 1).[12]  Dodd acknowledged that being able to plead to the lesser-included offense, which reduced her mandatory minimum sentence from ten years to five years in prison, and reduced her maximum sentence from life to forty years in prison, benefitted her. (Doc. 29 at 48).  The two-level reduction for acceptance of responsibility also decreased Dodd's final offense level from 32 to 30.  (See Crim. Doc. 379 at 36-38).  That reduction had the effect of lowering Dodd's advisory Guidelines sentencing range from between

---

[12]    At Dodd's sentencing hearing, the government stated that an offense level of 30 under-represented Dodd's participation in the conspiracy. (Crim. Doc. 379 at 5-6).  The Court agreed, and declined to accept a base offense level of 30, explaining that such an offense level did not capture Dodd's actual offense behavior.  (Id. at 8).  The Court applied a base offense level of 32 instead.  Dodd addressed the government's conduct on appeal, but the Eleventh Circuit held that the government did not breach the Plea Agreement by stating that it did not "really disagree with" a base offense level of 32.  Campbell, 434 F.App'x at 811.  Thus, Dodd did not receive the benefit of the stipulated offense level.  Nevertheless, she could not have known at the time she accepted the Plea Agreement that the Court would reject an offense level of 30, and it stands that this provision still induced her to plead guilty.

210 and 262 months in prison to between 168 and 210 months in prison.  <u>See</u> U.S.S.G.

Sentencing Table (2009).  Accordingly, I find that these incentives likely induced Dodd

to accept the Plea Agreement as well.

### V.      Recommended Disposition

#### A. Whether Counsel's Advice Was Deficient Under <u>Padilla</u>

The Supreme Court has held that counsel has a duty to advise his or her client of

the immigration consequences of pleading guilty.  <u>Padilla v. Kentucky</u>, 559 U.S. 356,

367-69 (2010).  The precise contours of that duty, however, depend on whether the

immigration ramifications are plain and clear.  Recognizing that there will "undoubtedly

be numerous situations in which the deportation consequences of a particular plea are

unclear or uncertain….[w]hen the law is not succinct or straightforward… a criminal

defense attorney need do no more than advise a noncitizen client that pending criminal

charges may carry a risk of adverse immigration consequences."  <u>Id.</u> at 369.  "But when

the deportation consequence is truly clear, as it was in [Padilla's] case, the duty to give

correct advice is equally clear."  <u>Id.</u>[13]

In <u>Padilla</u>, the defendant pled guilty "to the transportation of a large amount of

marijuana."  <u>Id.</u> at 359.  Counsel advised Padilla, who had been a lawful permanent

resident of the United States for more than 40 years, that he "'did not have to worry

about immigration status since he had been in the country so long.'"  <u>Id.</u> (quoting

<u>Commonwealth v. Padilla</u>, 253 S.W.3d 482, 483 (Ky. 2008)).  However, "the terms of

the relevant immigration statute [were] succinct, clear, and explicit in defining the

---

[13]      The Supreme Court further rejected any distinction between affirmative misadvice and non-advice.
<u>Id.</u> at 369-71.  Defense counsel have an affirmative duty to warn their clients about immigration
consequences as the circumstances require.

removal consequence for Padilla's conviction." Padilla, 559 U.S. at 368.  Under 8

U.S.C. § 1227(a)(2)(B)(i):

> Any alien who at any time after admission has been convicted of a
> violation of (or a conspiracy or attempt to violate) any law or regulation of
> a State, the United States or a foreign country relating to a controlled
> substance…, other than a single offense involving possession for one's
> own use of 30 grams or less of marijuana, is deportable.

Padilla, 559 U.S. at 368 (quoting 8 U.S.C. § 1227(a)(2)(B)(i)).  The Court explained that

"Padilla's counsel could have easily determined that his plea would make him eligible

for deportation simply from reading the text of the statute, which addresses not some

broad classification of crimes but specifically commands removal for all controlled

substances convictions except for the most trivial of marijuana possession offenses."

Padilla, 559 U.S. at 368.  Thus, the Court found that the law was sufficiently clear to

trigger counsel's heightened duty to give correct advice.  See id. at 369.  The Court also

devoted discussion to how immigration law has changed over the previous century, and

particularly since 1996, such that Congress has eliminated various avenues for

discretionary relief from deportation.  See id. at 360-64.  Accordingly, the Court decided

it was not a hard case in which to find deficiency: "The consequences of Padilla's plea

could easily be determined from reading the removal statute, his deportation was

presumptively mandatory, and his counsel's advice was incorrect."  Id. at 368-69.  Given

that "recent changes in our immigration law have made removal nearly an automatic

result for a broad class of noncitizen offenders," id. at 366, "constitutionally competent

counsel would have advised [Padilla] that his conviction for drug distribution made him

subject to automatic deportation," id. at 360 (emphasis added).

Here, Dodd pled guilty to trafficking more than 100 kilograms of marijuana, a controlled substance offense, which renders her deportable under 8 U.S.C. § 1227(a)(2)(B)(i) – the same "succinct, clear, and explicit" statute at issue in <u>Padilla</u>, <u>see</u> 559 U.S. at 368.  Dodd's conviction also renders her deportable under 8 U.S.C. § 1227(a)(2)(A)(iii) for having committed an "aggravated felony," which the INA defines to specifically include "illicit trafficking in a controlled substance," 8 U.S.C. § 1101(a)(43)(B).[14]  Therefore, just as in <u>Padilla</u>, the law was sufficiently clear and straightforward to trigger counsel's heightened duty to provide correct advice about immigration consequences.

But what is the content of "correct advice" under these circumstances?  The Supreme Court did not detail all that "correct advice" entails, but the <u>Padilla</u> opinion suggests that where a noncitizen faces a controlled substances conviction, that advice consists of two parts: (1) advising the client that deportation, as opposed to other immigration consequences, is the result, and (2) advising the client that deportation is effectively automatic.  <u>See</u> <u>Padilla</u>, 559 U.S. at 360 ("[C]onstitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation.").[15]

---

[14]   Indeed, the <u>Padilla</u> Court cited § 1101(a)(43)(B) to underscore the point that, with only limited exceptions, "discretionary relief [from deportation] is not available for an offense related to trafficking in a controlled substance."  559 U.S. at 364.

[15]   The <u>Padilla</u> opinion may have inadvertently muddied the waters by concluding "we now hold that counsel must inform her client whether his plea carries a <u>risk</u> of deportation."  <u>Id.</u> at 374 (emphasis added). That statement could imply that, even where the law is clear and the attorney has the duty to give "correct advice," counsel need do no more than advise a noncitizen client that he <u>may</u> be deported, but not about the inevitability of deportation.  That broad statement of the holding did not distinguish though, as the Court did elsewhere in its opinion, between cases where counsel has the duty to give correct advice, and cases where counsel must only warn the client about "the risk of adverse immigration consequences."  <u>Id.</u> at 369. One might interpret the holding as requiring an attorney merely to advise a client that there is a <u>risk</u> of deportation, even in cases where the law is clear and deportation is mandatory.

However, I do not find that to be the best interpretation of what <u>Padilla</u> requires where an attorney has the duty to give correct advice.  If the immigration consequences are straightforward, an attorney should

Rolle testified that he informed Dodd that a conviction would subject her to deportation proceedings, but he specifically recalled that he did not advise her whether deportation was either mandatory or likely. (Doc. 29 at 79-80). Rolle believed that Dodd could have successfully challenged deportation (id. at 92), and he did not know that Dodd was ineligible for virtually any form of discretionary relief (id. at 92-94). Rolle recalled that he gave Dodd the same advice about immigration consequences that he has given all his noncitizen clients since the early 1990's, i.e., that a conviction could subject them to deportation. (Id. at 71). However, such advice implies that a defendant could avoid removal, and it ignores that significant changes in immigration law since 1996 have "eliminated the Attorney General's authority to grant discretionary relief from deportation, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5-year period prior to 1996." Padilla, 559 U.S. at 363 (internal citations omitted). Consequently, the Supreme Court now describes deportation as "automatic," id. at 360, "virtually inevitable," id., and "presumptively mandatory," id. at 369, for a noncitizen convicted after 1996 of a removable offense. While Rolle did not affirmatively mislead Dodd into thinking that she would not be deported, as happened in Padilla, see 559 U.S. at 359, nor did he withhold advice, his advice was incomplete. Rolle correctly advised Dodd that she faced deportation, but he did not advise her that there was practically no way she could avoid removal. Counsel

---

advise a client charged with a removable offense not only that deportation is a consequence, but that it is an automatic consequence. For one, that is precisely what the Supreme Court stated "constitutionally competent counsel" would have advised Padilla. Id. at 360. Second, the Supreme Court devoted an entire section to describing how immigration law has changed, particularly since 1996, such that deportation is unavoidable for a noncitizen convicted of a removable offense. See id. at 360-64. Given that context, Padilla is best read as requiring counsel to inform a client charged with a removable offense (where it is clear that the offense is of a removable nature) not just that deportation is the consequence of a conviction, but that deportation is virtually unavoidable.

should have impressed on Dodd not only that deportation was a possible consequence of her conviction, but that it was practically inevitable.  See id. at 360; see also id. at 360-64 (devoting discussion to how "[t]he landscape of immigration law has changed dramatically," such that relief from deportation is no longer available for a noncitizen convicted of a removable offense).

Because counsel should "have advised [Dodd] that [her] conviction for drug distribution made [her] subject to automatic deportation," id. at 360 (emphasis added), I recommend finding that Rolle's guidance – while partially correct – was shy of the heightened standard to give correct advice that Padilla establishes.[16]

### B. Whether Dodd Would Still Have Pled Guilty if Given Correct Advice

Dodd must still show that Rolle's advice prejudiced her.  Here, Dodd must demonstrate that she would not have pled guilty, but that she would have gone to trial, had counsel informed her that deportation was certain rather than merely possible.  See Hill v. Lockhart, 474 U.S. 52, 59 (1985).  Strickland does not require Dodd to show "more likely than not" that she would have gone to trial, but it does require Dodd to show that the likelihood of a different result is "substantial, not just conceivable."  Harrington v. Richter, 562 U.S. 86, 111-12 (2011) (citing Strickland, 466 U.S. at 693).  A reasonable

---

[16]     Although Rolle's advice fell short of the standard of effective assistance that Padilla establishes, I observe that Padilla had not been decided at the time Rolle advised Dodd with respect to her guilty plea. (See Doc. 19 at 13).  Padilla applies to Dodd's case, without doing so retroactively, because the Supreme Court rendered its decision before Dodd's conviction and sentence became final.  (See id.)  However, at the time Rolle represented Dodd, Eleventh Circuit precedent held that deportation was a collateral consequence of a conviction, about which defense attorneys did not have a duty to advise their clients. United States v. Campbell, 778 F.2d 764, 768-69 (11th Cir. 1985).  A number of other courts, including at least five other circuit courts of appeal, also adhered to this view.  See Padilla, 559 U.S. at 365 n.9 (collecting cases).  Thus, while the Padilla Court rejected the distinction between direct and collateral consequences insofar as deportation is concerned, id. at 365, the fact that Rolle advised noncitizen clients at all that they may be deported was beyond what circuit precedent required at the time.

likelihood of prejudice exists if Dodd can show "that a decision to reject the plea bargain would have been rational under the circumstances." Padilla, 559 U.S. at 372.  Although it is a close question, I recommend finding that there is not a substantial likelihood that Dodd would not have pled guilty under the particular circumstances of this case.

When the Supreme Court decided Padilla, it did not resolve whether counsel's advice prejudiced him, but remanded the case for further proceedings.  559 U.S. at 374-75.  The Kentucky trial court found that the evidence against Padilla was so strong that it would not have been rational to go to trial, and thus he had not suffered prejudice. See Padilla v. Commonwealth, 381 S.W.3d 322, 328 (Ky. Ct. of App. 2012).  The Kentucky Court of Appeals reversed, explaining that Padilla did not have to show that he would have been acquitted at trial, but only "that his counsel's ineffective performance affected the outcome of the plea process.  Stated differently, Padilla had to demonstrate that he rationally would have insisted on a trial, not that an acquittal at trial was likely." Id. (emphasis in original) (internal citation omitted).  Noting, as the Supreme Court did, that "preserving the noncitizen's right to remain in the United States 'may be more important to the [defendant] than any jail sentence,'" the Kentucky Court of Appeals determined that the defendant's desire to avoid deportation is the predominant factor in the prejudice analysis.  See id. at 329 (quoting Padilla, 559 U.S. at 368). Because Padilla was responsible for supporting a wife and three disabled children, he was fifty years old, he had been in the country for more than forty years, and he had testified that deportation was like "putting a gun" to his head, the court concluded there was a reasonable probability that he would have gone to trial had he known he would be deported.  Padilla, 381 S.W.3d at 329-30.

Notwithstanding that, the Kentucky Court of Appeals added that the defendant's desire to avoid deportation is "not the exclusive factor when determining whether a particular defendant's decision to insist on a trial would have been rational[.]"  Id. at 329. The court also observed that the evidence against Padilla was "far from conclusive," and that a jury could reasonably have acquitted him.  Id. at 330.  The circumstances of Padilla's arrest, which were not detailed in the Supreme Court's opinion, were as follows:

> In 2001, Padilla was at an Interstate 65 weigh station in Hardin County when an inspector noticed that Padilla did not have a KYU number and appeared nervous. The inspector also observed that Padilla was "off route." During a consensual search of the truck cab, marijuana and drug paraphernalia were found and Padilla was arrested.
>
> Upon opening the tractor-trailer truck's doors, a box fell and tore. The police contend that the box revealed only a white styrofoam inner package while Padilla contends that drugs were plainly visible. According to Padilla, after the drugs were visible, he was asked what was in the load and responded "maybe, drugs." The police contend that the question was asked and answered before the drugs were visible. It is not disputed that a search of the truck revealed a substantial quantity of marijuana.
>
> Padilla testified that he had no knowledge that he was transporting boxes of marijuana until the search. He explained that he was a self-employed tractor-trailer owner and obtained loads through several brokers. He had no right to inspect the load's contents and checked only for its quantity and weight. On the date of his arrest, he testified that he believed he was transporting a partial load of Nestle chocolates from California to Illinois and a second partial load of dehydrated abalone from California to Detroit. Although he had not planned on traveling through Kentucky, during his trip the tractor-trailer began to have axle problems and he took a Kentucky route because it was less hilly than his planned route. He testified that he had not checked Kentucky's road tax procedures.

Id. at 327.  Padilla was charged with transporting marijuana, but under Kentucky law, a jury would have had to find that Padilla "knowingly" trafficked in marijuana.  Id. at 330 n.3.  Accordingly, the court explained:

> A reasonable jury could find that Padilla was unaware that the load he transported contained marijuana and acquit him of the deportable offense. Padilla testified that he had no right to inspect the contents of the load he transported and was unaware that he was transporting marijuana. Under the facts, it would be reasonable for counsel to argue to a jury that Padilla's actions were inconsistent with a person who had knowledge of the load's contents. Arguably, had he known, he would have paid Kentucky's road taxes to avoid an investigative stop and possible search. Moreover, a reasonable juror could conclude that if Padilla was aware of the substantial amount of marijuana he was transporting, he would have placed it securely in the front of the trailer behind the legal load he transported, instead of the rear where it would be revealed merely upon opening the trailer's doors.

Id. at 330. Thus, the fact that the inculpatory evidence was not conclusive, and that Padilla would have had a viable defense had he gone to trial, influenced the court's determination that it would have been rational for Padilla to reject the plea bargain and go to trial.

The court lastly noted that "Padilla's plea bargain was not as favorable as he believed." Id. Padilla's maximum sentence would have been ten years in prison even if he had been tried and convicted, yet his sentence under the plea agreement was still ten years, five of which were probated. Id. Moreover, Padilla's attorney affirmatively misadvised him by assuring him that he would not be deported. Padilla, 559 U.S. at 359. The opinion of the Kentucky Court of Appeals suggests that Padilla accepted the plea offer in specific reliance on the belief that he would not be removed. See Padilla, 381 S.W.3d at 330 ("Based on the testimony at the [post-conviction] hearing, Padilla accepted the offer on the day of trial only because he believed he would not be deported and released on parole."). That belief turned out to be patently incorrect, and in view of all of the circumstances, the court concluded it would have been rational for Padilla to reject the plea agreement and proceed to trial. Id.

Dodd's case is distinguishable from Padilla in several respects.  For one, unlike in Padilla, Dodd's attorney did not affirmatively mislead her into believing that she would not be deported.  Compare Doc. 29 at 79-80 with Padilla, 559 U.S. at 359.  Nor did he simply remain silent on the topic.   Rather, Dodd's attorney did inform her that a conviction would subject her to deportation proceedings.  (Doc. 29 at 70-73, 79-80).  Even if that advice was incomplete for not further impressing on her that deportation was unavoidable, it meant Dodd at least pled guilty aware of the risk that she could be deported.  The fact that Dodd was aware of that possibility lessens the likelihood that she suffered prejudice.  See Gutierrez v. United States, 560 F.App'x 924, 927 (11th Cir. 2014) (per curiam) (affirming district court's denial of § 2255 relief under Padilla where petitioner, who pled guilty to a controlled substances offense, was independently aware of the "risk" of deportation).  Because counsel advised Dodd that a conviction would subject her to deportation proceedings, he at least introduced the possibility of deportation into Dodd's decision-making process.  That is different from where an attorney affirmatively advises their client that they will not be deported, which induces the defendant to discount immigration consequences altogether, or where an attorney remains silent on the matter, which never introduces the issue at all for the defendant's consideration.  Accordingly, the prejudice analysis here occurs in a context where the probability of a different result is less substantial.  The Court is not examining the likelihood that Dodd would have chosen differently after having been assured not to worry about deportation, in which case the probability of a different result would surely be greater.  Rather, the Court is only examining whether Dodd would not have pled

guilty had counsel taken the additional step of informing her that deportation was not just possible, but virtually guaranteed.[17]

Given the surrounding circumstances of Dodd's guilty plea, it is very unlikely that informing her that relief from deportation was unavailable – when she was already aware that deportation was a risk – would have changed her mind.  Dodd was chiefly motivated to plead guilty by the news that her daughter was going to testify against her. Although Dodd had been eager to go to trial, she became "deflate[d]" upon learning that her daughter was going to be a witness.  (See Doc. 29 at 77; see also id. at 98-99). Dodd thereafter expressed an interest in a plea agreement (id. at 77-78), indicating that she wanted to plead guilty to avoid being confronted by her daughter in court (or to prevent her daughter from having to confront her in court).  This factor alone seemed to impact Dodd significantly enough that it is unlikely any further advice about immigration consequences would have altered her decision.

Moreover, Dodd's attorney, having watched the trial of Dodd's sons, had advised that the government's evidence was "quite strong."  (Id. at 74-76).  Indeed it was.  The evidence that was admissible against Dodd[18] showed that she had been suspected of trafficking narcotics between California and Florida since 2006 (see Crim. Doc. 301 at 13-34, 36-61); that law enforcement twice stopped her at LAX on suspicion of drug trafficking, where she lied both times about the amount of currency and luggage she was carrying (id.); police recovered a firearm, a large amount of cash, and marijuana

---

[17]     Indeed, while Dodd claims that she pled guilty ignorant of the immigration consequences, she does not claim that she pled guilty in specific reliance on the belief that she would not be deported.
[18]     Before trial, Dodd successfully moved to suppress boxes of shipping receipts and other documents, which law enforcement had seized from her home or as a result of the search of her home.  (See Crim. Doc. 147, Report and Recommendation at 30-36; Crim. Doc. 200, Order Adopting Report and Recommendation).  Thus, I only consider the evidence that remained admissible against Dodd.

from a car that she rented and which her son was driving (see Crim. Doc. 71 at 2); the

government had subpoenaed the records of an airline company to illustrate Dodd's

frequent travels between Florida and California (from which the marijuana came) (see

Crim. Doc. 340 at 186-92); and there were witnesses, apparently including her

daughter, able to implicate Dodd in the drug conspiracy[19] (see e.g., Crim. Doc. 300,

Trial Tr. Vol. I at 55-58; Crim. Doc. 246, USA's Witness List; Doc. 29 at 73-74, 77, 98-

99).[20]  Through her sons' trial, Dodd even had the opportunity to preview how the

evidence would play out before a jury, and she saw the jury find both of her sons guilty.

Three days after the trial, Dodd's daughter pled guilty, which left Dodd the only

codefendant left standing.  Unsurprisingly, Dodd pled guilty the next day.  Thus, the

timing and circumstances surrounding Dodd's guilty plea reflect that she understood

she would almost certainly be convicted if she went to trial.  Unlike in Padilla, there is

little to suggest that Dodd had a viable defense.  Furthermore, even had counsel

advised her that pleading guilty made her automatically deportable, she surely would

have reasoned that a guilty verdict rendered her equally deportable.  Accordingly, Dodd

anticipated that she would be convicted, she decided to cut her losses by pleading

guilty, and she would have done the same even with complete advice about immigration

---

[19]     The government's witness list as to Sonia Dodd (Crim. Doc. 246) enumerated thirty witnesses, including individuals who were friends or acquaintances of Dodd's family.  Such individuals included people who testified for the United States in the trial against Dodd's sons, including: Michael Carter (Crim. Doc. 339 at 68-116), Spencer Enochs (Crim. Doc. 338 at 86-168), Nicholas Gay (Crim. Doc. 339 at 116-68), Tony Moses (Crim. Doc. 339 at 210-39), and Clyde Singletary, III (Crim. Doc. 339 at 14-68).

[20]     The strength of the government's evidence is not so much relevant to show that a jury would have found Dodd guilty, for Strickland's prejudice prong does not require her to prove that she would have been acquitted had she gone to trial.  See, e.g., United States v. Orocio, 645 F.3d 630, 643 (3d Cir. 2011), abrogated on other grounds by Chaidez v. United States, 133 S. Ct. 1103 (2013).  Rather, the strength of the government's evidence, in conjunction with the fact that Dodd was aware of the evidence, is relevant to show that it influenced her decision to plead guilty.  That is, Dodd's knowledge of the strength of the evidence makes it likely that she would still have pled guilty in order to avoid the consequences of what she perceived to be a near-certain conviction.

consequences.  Notably indeed, it was Dodd who initiated discussion of a plea agreement.  (Doc. 29 at 77-78).

Further unlike <u>Padilla</u>, Dodd's plea bargain actually enabled her to cut her losses.  Despite the last-minute nature of the negotiations, Dodd obtained a beneficial plea agreement.  The agreement permitted her to plead to a lesser-included offense, and it reduced her offense level on account of accepting responsibility.  (<u>See</u> Crim. Doc. 269 at 1-3).[21] Permitting Dodd to plead guilty to a lesser-included offense lowered her mandatory minimum sentence by five years, and it reduced her maximum sentence from life in prison to 40 years.  (Doc. 29 at 48).  The two-offense-level reduction for acceptance of responsibility also decreased her offense level from 32 to 30 (<u>see</u> Crim. Doc. 379 at 36-38), which lowered her sentencing range from between 210 and 268 months in prison to between 168 and 210 months in prison, <u>see</u> U.S.S.G. Sentencing Table (2009).  The Court sentenced Dodd within that range, to 175 months in prison.  (Crim. Doc. 379 at 94).  Indeed, Dodd acknowledged that the Plea Agreement benefitted her.  (Doc. 29 at 48).

Between the strength of the evidence against Dodd, the plea bargain, and especially Dodd's desire to avoid confronting her daughter in court, it would have been neither rational nor substantially likely that Dodd would have insisted on going to trial.  Even had counsel notified Dodd that she was ineligible for relief from deportation, it appears that other circumstances would have led her to accept the plea offer anyway.

---

[21]    As noted earlier, the Plea Agreement also stipulated to a base offense level of 30, but Dodd did not receive the benefit of that provision in the end.  Still, that stipulation formed part of the inducement for Dodd to plead guilty.

One factor – albeit an important one – weighs in favor of finding prejudice.  That factor is Dodd's connection to the United States, which includes having lived here since the age of four; having been educated here; and the fact that her family resides here. To be sure, a defendant's desire to avoid deportation from the country they call home may be more important than any prison sentence.  Hernandez v. United States, 778 F.3d 1230, 1234 (11th Cir. 2015) (citing Padilla, 559 U.S. at 368).[22]  However, the prejudice analysis cannot be reduced to a single factor, for determining the existence of prejudice requires a case-by-case analysis.  See Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) ("In assessing prejudice, courts 'must consider the totality of the evidence before the judge or jury.'") (quoting Strickland, 466 U.S. at 695); Lockhart v. Fretwell, 506 U.S. 364, 369 n.2 (1993) ("Our opinion does nothing more than apply the case-by-case prejudice inquiry that has always been built into the Strickland test.").  Here, the totality of the circumstances – including the fact that Dodd had learned her daughter would testify against her, the strength of the government's case (which Dodd likely understood made a conviction nearly certain), the favorability of the plea agreement,

---

[22]    In Hernandez, the Eleventh Circuit held that a district court abused its discretion by denying a petitioner's Padilla claim without holding an evidentiary hearing.  Hernandez, 778 F.3d at 1232.  Specifically, the court found that the district court erred by ruling that Padilla did not govern counsel's performance.  Id. In regard to prejudice, the court only observed that "Hernandez alleged that he would not have pleaded guilty if a plea would have 'automatically remove[d] him from his family and from a Country he ha[s] called home all [of] his adult life.'"  Id. at 1234.  The court stated that Hernandez had "alleged facts that, if true, would prove that he was prejudiced by his counsel's deficient performance."  Id. at 1234 (emphasis added). As the court rendered Hernandez in the narrower context of finding that a petitioner had made sufficient allegations to warrant an evidentiary hearing, it did not establish a standard for determining the existence of prejudice where, as here, the district court has undertaken an evidentiary hearing.  Accordingly, Hernandez does not mean that a petitioner's mere allegation that they would not have pled guilty, had they known they would be deported, is enough to actually prove prejudice.

and the fact that Dodd was already aware a conviction would subject her to deportation proceedings – cumulatively weigh against finding prejudice.[23] [24]

In addition to the foregoing, I do not credit Dodd's claim that she would have insisted on going to trial had she known deportation was certain.  Dodd has a substantial record of dishonesty.  True, Dodd testified that because of her family and roots in this country, she would not have pled guilty had she known she would be deported.  But Dodd has also given demonstrably false testimony under oath before, either at the plea colloquy (where she admitted to the truth of the charges and the factual basis) or the evidentiary hearing (where she claimed she is entirely innocent). (Compare Crim. Doc. 310 at 29-38 with Doc. 29 at 23, 54).  Dodd has fourteen convictions for crimes involving dishonesty, ranging from fraud to forgery to use of stolen or fake driver's licenses.  (See PSR at 13-18).  Dodd has used several aliases, social security numbers, and birth dates.  (Id. at second and third unnumbered pages). Dodd patently lied under oath by claiming she has never violated probation, when she

---

[23]     Some additional factors also weigh against finding prejudice.  One is Dodd's ability to adapt to her destination country following deportation.  Dodd is still in her 40's and reasonably well-educated.  The United Kingdom is a country that shares the same language, a broadly similar culture to the United States, and possesses political stability.  Accordingly, Dodd would likely be able to adapt to being a citizen of the United Kingdom.  Second, Dodd is not the caretaker of any family members, as the defendant was in Padilla, see 381 S.W.3d at 330, nor does she rely on other family members to be her caretaker.  Third, there is little indication that Dodd's guilty plea was the result of family influence, as was the case in Padilla, see 381 S.W.3d at 327 ("Padilla testified that he pleaded guilty only because his wife, Ingrid, and daughter, Yoshii, were distraught over his potential prison sentence.").  Here, by contrast, Dodd's decision to plead guilty appears to have been a move calculated to be in her own self-interest.  Each of these factors lessens the likelihood that she would have rejected the plea offer, even had counsel informed her that deportation to the United Kingdom would be practically mandatory.

[24]     That Dodd was eager to go to trial until the eve of jury selection (see Doc. 29 at 68) could also be construed as a factor suggesting that she would have gone to trial if given complete advice.  However, Dodd's desire to go to trial seemed to evaporate once she discovered her daughter was going to testify against her.  (See id. at 77, 98-99).  Thus, Dodd's eagerness to go to trial, up until the point when she learned her daughter would be a witness, only reflects how significantly the news about her daughter impacted her decision.  That reinforces the conclusion that Dodd's desire to avoid being confronted by her daughter in court would have led her to plead guilty, even had she received more complete immigration advice.

has done so six times.  (Compare Doc. 29 at 31 with PSR at 13-18).  Dodd likely lied

when she claimed she was completely unaware that she was deportable (e.g., Doc. 29

at 22), even though her detention order noted that she could be deported if convicted

(Crim. Doc. 71 at 2) and Wade Rolle testified that he advised her of the risk (Doc. 29 at

79-80).  Dodd has also previously claimed that her conviction or indictment should be

dismissed for reasons ranging from medication to "massive" newspaper and internet

publicity.  (See Crim. Doc. 284, Motion to Withdraw Guilty Plea; Crim. Doc. 287, Motion

to Dismiss Indictment; Doc. 2, Supporting Memorandum).[25]  Dodd's instant Padilla claim

appears to be just one more among many attempts to escape liability.  Accordingly,

Dodd's contention that she would have gone to trial if advised differently carries little

credibility.

     For all of the aforementioned reasons, I recommend finding that Rolle's advice

did not prejudice Dodd.  Certainly, Dodd's ties to the United States, and her relative lack

of ties to the United Kingdom, are an important factor that weigh in favor of finding

prejudice.  A reasonable jurist could find this factor significant enough to warrant such a

finding.  See Orocio, 645 F.3d at 645.[26]  However, given the totality of the

circumstances surrounding Dodd's guilty plea, her record of dishonesty, and given that

she had already been advised that there was a risk of deportation, I do not find it

---

[25]     Indeed, Dodd contended in the supporting memorandum accompanying her § 2255 motion that her guilty plea was involuntary because she was under the influence of medications.  (Doc. 2 at 17-19). However, as the District Judge explained in denying this claim, Dodd assured the Court, under oath, during her plea colloquy that none of the medications she was taking impaired her ability to understand the plea process or the consequences of her decision.  (Doc. 19 at 25-26; see also Crim. Doc. 310 at 12-14).

[26]     Orocio though, like Hernandez, was decided in the more limited context of holding that a district court erred in failing to hold an evidentiary hearing, and that the petitioner had made sufficient allegations of deficiency and prejudice under Padilla to warrant a hearing.  See 645 F.3d at 646-47. But Orocio did not purport to establish a comprehensive framework for how a court, which has conducted a fact-intensive evidentiary hearing, must analyze prejudice once it has become familiar with the totality of the circumstances.

substantially likely that she would have continued to trial if only counsel had further informed her that deportation was effectively mandatory.

## VI.    Conclusion

Thus, in response to the Court's request that I conduct an inquiry consistent with Padilla v. Kentucky and Strickland v. Washington, I recommend the following: (1) although trial counsel, Wade Rolle, advised Dodd that a conviction could subject her to deportation, such advice was deficient for not further informing her that deportation was effectively mandatory, but (2) there is not a substantial likelihood that such additional advice would have caused Dodd not to accept the Plea Agreement, given the totality of the circumstances in this case.  I therefore recommend that Judge Howard deny Sonia Dodd's § 2255 motion (Doc. 1).

**DONE AND ENTERED** at Jacksonville, Florida this 4th day of May, 2015.


MONTE C. RICHARDSON
United States Magistrate Judge


Copies:

The Honorable Marcia Morales Howard
United States District Judge

Petitioner Sonia Dodd
Counsel of record